UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| DAVID HARRIS, | ) | |
|---|---|---|
| Plaintiff, | ) | Case No. 13-cv-8584 |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | Judge John W. Darrah |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff David Harris filed a Third Amended Complaint ("TAC"), alleging a claim for malicious prosecution and other torts under the Federal Tort Claims Act ("FTCA"), against the United States of America (the "Government"). The Government filed a Motion for Summary Judgment [136] on all counts. For the reasons set forth below, the Government's Motion for Summary Judgment [136] is granted in part and denied in part.

## LOCAL RULE 56.1

Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the party contends there is no genuine issue for trial." *Ammons v. Aramark Uniform Servs.*, 368 F.3d 809, 817 (7th Cir. 2004). Local Rule 56.1(b)(3) requires the nonmoving party to admit or deny every factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A nonmovant's "mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). In the case of any disagreement, the nonmoving party must reference affidavits, parts of the record, and other materials that support his stance. Local Rule 56.1(b)(3)(B). To the extent that a response to a

statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted. *See Graziano v. Vill. of Oak Park*, 401 F. Supp. 2d 918, 936 (N.D. Ill. 2005). Similarly, to the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Pursuant to Local Rule 56.1(b)(3)(C), the nonmovant may submit additional statements of material facts that "require the denial of summary judgment."

A district court is entitled to expect strict compliance with Rule 56.1; substantial compliance is not enough. *Ammons*, 368 F.3d at 817. "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) (quoting *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009)).

## BACKGROUND

The following facts are taken from the parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1.[1]

*The Walton Street Neighborhood Investigation*

---

[1] Plaintiff disputed many of the facts in the Government's Statement of Facts and provided lengthy responses to many of them. While many of these responses cite to evidence on the record, they often provide extraneous or argumentative information. As noted above, substantial compliance with Local Rule 56.1 is not enough. To the extent that Plaintiff's responses are not in strict compliance with Local Rule 56.1, the facts that are not properly disputed will be deemed admitted for the purposes of this Motion.

In January of 2009, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") opened the Walton Street Neighborhood ("WSN") Investigation. Report of Investigation ("ROI") No. 1 of the WSN Investigation states that its purpose was to investigate "a group of organized criminals comprised of gang members from the Mafia Insane Vice Lords, Black Gangster Disciples, 4 Corner Hustler Vice Lords, Breeds, Conservative Vice Lords and Traveling Vice Lords." ROI No. 1 also states that "members of these street gangs control and sell crack cocaine and heroin while armed with firearms in the areas of Walton and Iowa Streets and Kolin and Keeler Streets in Chicago, Illinois." ATF suspected that someone named Ivan "Pimp" Thomas controlled a large-scale operation that sold firearms and illegal drugs in the Walton Street area. (Dkt. 145 ¶ 4.)

ATF Special Agents John Rotunno and Larissa Baccus were the case agents on the WSN Investigation, and they worked with a confidential informant ("CI") to carry out controlled drug and gun buys. The CI lived in the Walton Street neighborhood, got to know the individual dealers who operated there, and then introduced the dealers to undercover ATF agents who purchased illegal drugs and guns. The CI who assisted with the WSN Investigation had worked with ATF since 2004 and had known Rotunno for years because his mother and father were confidential informants. Prior to the WSN Investigation, the CI had assisted with numerous investigations where he wore recording devices, introduced ATF agents to criminal suspects, and testified in federal and state court. (Dkt. 145 ¶ 7.)

The CI assisted ATF in identifying dealers in the Walton Street area. ATF agents would show the CI a government photo of a potential target of the investigation, with all personal identifying information removed, and then ask the CI whether the person in the photo was the

3

same person he knew by a street nickname. (Dkt. 145 ¶ 9.) Agent Rotunno testified that the CI and ATF would also work with the Chicago Police Department ("CPD") to identify potential targets. The CI would call Rotunno and tell him an individual who he knew only by nickname was at a specific location. Rotunno would then contact CPD and ask them to do an investigatory stop so that CPD could find out the individual's legal name. (Id.)

The CI's relationship with ATF was subject to a written informant agreement, which states that he was not a law enforcement officer, an employee, or agent of ATF, and that he would not participate in any unlawful activities or initiate any plans to commit criminal acts. (Dkt. 145 ¶ 12.) The CI testified that he was also subject to biweekly drug tests throughout the WSN Investigation, which he submitted to Rotunno and his parole officer. (Dkt. 145 ¶ 13.) The CI was also subject to Semi-Annual Informant Status Reports and Confidential Informant Continuing Suitability Reviews. Updated criminal history records were attached to these reviews. (Dkt. 145 ¶ 14.)

Throughout the course of the WSN Investigation, Rotunno and Baccus provided information to state and federal prosecutors. Rotunno and Baccus also testified that they provided state and federal prosecutors with written reports on a rolling basis. (Dkt. 145 ¶ 18.)

*The Identification of "Little Head"*

During the WSN Investigation, the CI told Rotunno about a man he knew only as "Little Head" who sold narcotics in the Walton Street area. The CI testified that he had known "Little Head" for several years and had met with him on several occasions. (Dkt. 145 ¶ 19.) On May 6, 2009, Rotunno showed the CI a photograph of Harris with all personal identifying information covered. Rotunno asked the CI if the photograph was "Little Head". The CI stated

that it was and initialed the photograph. (Dkt. 145 ¶ 20.)

ROI No. 193, created by Rotunno, states that on September 11, 2009, CPD Officers contacted him and advised that they stopped two persons who identified themselves as "Little Head" and "Face." (Dkt. 145 ¶ 21.) According to the CPD, "Little Head" was identified as David Harris. The CPD Officers also advised that "Little Head" was wanted for domestic battery and would be taken into custody. (Dkt. 145 ¶ 21.) Rotunno subsequently received photographs and criminal history reports on both persons and attached them to his report. (Dkt. 145 ¶ 21.) The criminal history for Harris attached to this report was dated May 8, 2009. (Id.) It does not show any arrests or convictions for domestic battery. (Dkt. 152 ¶ 26.)

On October 30, 2009, the CI and Agent Larissa Baccus purchased 40 bags of crack cocaine from "Little Head." (Dkt. 145 ¶ 23.) Rotunno and other officers and agents conducted back-up surveillance of the drug buy. (Id.) Rotunno and Baccus stated in their declarations that they and the other team members met to debrief and go over the plan and procedures for the operation. They also stated that during this meeting, they reviewed Harris' photo to enable Baccus and the other team members to confirm that the person who had been identified as "Little Head" was the same person who came to the drug buy. (Dkt. 145 ¶ 24.) This drug buy was recorded using audio and video surveillance. Baccus and Rotunno also documented the operation in written reports. (Dkt. 145 ¶ 30.)

In July of 2010, Anthony Grant, a known affiliate of Thomas, agreed to cooperate with ATF and federal prosecutors. On July 26, 2010, Baccus interviewed Grant regarding Thomas' narcotics operation. In her report of the interview, Baccus referred to an individual named "'Teddy Tinsley' aka 'Little Head.'" (Dkt. 145 ¶ 37.) The report also stated that Tinsley no

5

longer sold heroin for Thomas because he was caught selling heroin from another source along with the heroin he received from Thomas. Baccus also noted that Tinsley was beat up for this by "David Harris aka 'Barney'" and two other men. (Id.) In her deposition, when asked about this report, Baccus testified that she may have inadvertently inverted the nicknames for "Barney" and "Little Head." (Id.) On August 12, 2010, Baccus showed Grant a photograph of Harris. Grant identified Harris as "Little Head", and initialed and dated the photograph. (Dkt. 145 ¶ 38.)

The WSN Investigation lasted from approximately January 9, 2009, through September 28, 2010. During the year following the October 20, 2009 drug buy, Rotunno and Baccus prepared additional ROI that purport to document information they received about "Little Head" from the CI. The reports state that the CI saw "Little Head" on the street on several occasions between January and June of 2010. However, Harris was arrested on November 7, 2009 on an unrelated drug possession charge and was taken into custody at Cook County Jail until August 9, 2010. (Dkt. 152 ¶¶ 39,40.) Harris was then transferred to the Illinois Department of Corrections to serve a two-year jail sentence. (Dkt. 145 ¶ 33.)

On September 27, 2010, Thomas, Harris, and several other gang members were criminally charged. An arrest warrant was issued for Harris that same day. Thomas and members of his organization were arrested on September 28, 2010. Harris was already in Illinois Department of Corrections custody at that time. (Dkt. 145 ¶¶ 40-42.) On October 5, 2010, Rotunno reviewed several photographs seized from Thomas' apartment pursuant to a federal search warrant. (Dkt. 152 ¶ 47.) During that review, the CI identified several of the people in the photographs. (Id.) Harris alleges that the CI identified two different people in separate photographs as "Little Head". Harris does not deny that he was one of the people identified in

6

the photographs as "Little Head." (Id.)

On October 25, 2010, a Cook County grand jury returned an indictment against Harris for two counts of manufacture or delivery of cocaine. (Dkt. 145 ¶ 44.) Harris was arraigned and entered a plea of not guilty on November 15, 2010. (Dkt. 145 ¶ 45.) On January 31, 2011, the parties agreed to continue the case to allow Harris' attorney to review video of the October 30, 2009 drug buy. The case was continued by agreement again on March 22, 2011 to allow the parties to review the video together. On March 28, 2011, the Assistant State's Attorney stated that the video of the drug buy "doesn't change anything." (Dkt. 145 ¶ 45.) The Assistant State's Attorney filed a motion for *nolle prosequi* and the case was terminated on December 12, 2011. (Dkt. 145 ¶ 46.)

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Courts deciding summary judgment motions must view facts "in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the initial burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, "[t]he nonmoving party must point to specific facts showing that there is a genuine issue for trial." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Factual disputes do "not preclude summary

judgment when the dispute does not involve a material fact." *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015). The evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

**ANALYSIS**

Harris asserts claims against the Government under the FTCA, 28 U.S.C. §§ 1346(b), 2671-2680, for malicious prosecution, abuse of process, intentional infliction of emotional distress, and negligent infliction of emotional distress. Under the FTCA, the substantive law of the place where the acts or omissions occurred is applied, in this case, Illinois. 28 U.S.C. § 1346(b)(1).

*Malicious Prosecution*

To establish a claim for malicious prosecution under Illinois law, Harris must show: (1) commencement or continuation of the original criminal proceeding; (2) termination of the proceeding in his favor; (3) the absence of probable cause; (4) malice; and (5) damages. The failure to establish any one element bars recovery. *Cairel v. Alderden*, 821 F.3d 823, 834 (7th Cir. 2016).

Termination of Proceedings

Harris' criminal proceedings were terminated when the Assistant State's Attorney moved for *nolle prosequi*. Harris suggests that his case was terminated after the Assistant State's Attorney reviewed video of the October 30, 2009 drug buy. Harris claims this video exonerated him. (TAC ¶ 21.) However, the record provides no basis or explanation for the motion for *nolle prosequi*. The order entered by the Cook County Circuit Court stated, "M/S [motion of the

8

state] Nolle. Release from custody as to this case only." (Dkt. 152 ¶ 46.) The Seventh Circuit has held that a *nolle prosequi* dismissal terminates a proceeding in favor of the accused "unless the abandonment is for reasons not indicative of the innocence of the accused." *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001) (quoting *Swick v. Liautaud*, 662 N.E.2d 1238 (Ill. 1996)). The plaintiff bears the burden of showing that the *nolle prosequi* was entered for reasons consistent with his innocence. *Id.*

In the absence of reasons for the *nolle prosequi* dismissal on the record, both parties argue that the circumstances surrounding the dismissal support their arguments. The Government argues that the Assistant State's Attorney intended to move forward with Harris' case for over a year but that Harris' speedy trial demand and the unavailability of a key witness may have motivated the motion for *nolle prosequi*. Harris argues that the Government's choice not to move forward with his case for over a year and the ATF agents' failure to appear in court in response to subpoenas is evidence that the prosecution was terminated in his favor.

The Assistant State's Attorney's requests for continuance are not evidence in favor or against either party's argument. Such requests can be made for many different reasons, and are not indicative of the strength of the evidence for or against either party's case. The length of time of the proceedings prior to dismissal does not compel an inference that the Government lacked reasonable grounds to pursue Harris' prosecution. However, there is a clear issue of fact as to whether the ATF agents' failure to appear in response to subpoenas was a "refusal" to appear, and whether this "refusal" was indicative of the strength of the Government's case. Harris cites to several cases to support his contention that the failure of a witness to appear is enough to defeat summary judgment on the issue of favorable termination. In each of these

9

cases, the complaining witness who refused to testify was the person who initiated the criminal proceedings or was otherwise unresponsive.[2] The agent who initiated criminal proceedings against Harris contacted the Assistant State's Attorney after receiving his subpoenas and was not told to appear. (Dkt. 152 ¶ 61; Def. Exh. 2, Rotunno Dep. Tr. at 133-134.) The Government contends that this is evidence that Rotunno was willing to testify, but did not appear because he did not receive instruction to do so from the Assistant State's Attorney. There are no facts alleged that support the Government's contention. The evidence only supports the allegation that the agent received the subpoenas and contacted the Assistant State's Attorney.

The Government also argues that there is no evidence that the video of the October 20, 2009 drug buy exonerates Harris. Court transcripts show that both parties reviewed the video eight months prior to the *nolle prosequi* and reported that the video "doesn't change anything." The Government argues that their decision to move forward contradicts Harris' claim that proceedings were terminated due to lack of reasonable grounds. The circumstances surrounding this review and the actual contents of the video recording are not established by the record. This is another fact issue that should be explored at trial. As indicated above, there is a genuine issue of material fact as to whether Harris' criminal proceedings were terminated in his favor.

## Probable Cause

---

[2] *Lopez v. City of Chicago*, No. 09 C 3349, 2011 WL 1557757 at *3-4 (N.D. Ill. Apr. 25, 2011); *Edwards v. Vill. of Park Forest*, 2009 WL 2588882 at *6 (N.D. Ill. Aug. 20, 2009); *Mahaffey v. Misner,* 2009 WL 2392087 at *3 (N.D. Ill. July 31, 2009); *Woods v. Clay,* 2005 WL 43239 at *15 (N.D. Ill. Jan. 10, 2005); *Petrovic v. City of Chicago,* No. 06 C 6111, 2008 WL 4286954 at *4, *10 (N.D. Ill. Sept. 16, 2008).

"In a malicious prosecution case, probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Williams v. City of Chicago,* 733 F.3d 749 (7th Cir. 2013). "For a malicious prosecution claim, probable cause is determined based upon the facts known to the prosecution at the time of filing, 'not the actual facts of the case or the guilt or innocence of the accused.'" *Cairel,* 821 F.3d at 834 (quoting *Sang Ken Kim v. City of Chicago*, 858 N.E.2d 569, 574 (2006)). The probable cause determination must be made by a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them. *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008).

Indictment by a grand jury establishes *prima facie* probable cause. This presumption can be rebutted by proving "that the indictment was obtained by false or fraudulent testimony before the grand jury, or by failing to make a full or complete statement of facts, or by other improper or fraudulent means." *Friedes v. Sani-Mode Mfg. Co.,* 211 N.E.2d 286, 289 (Ill. 1965); *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015). Harris argues that the Government is not entitled to this presumption because his grand jury indictment was obtained by improper or fraudulent means. First, Harris makes several claims regarding the reliability of the evidence supporting ATF's identification of Harris as "Little Head." Harris argues that the facts known by Special Agent Rotunno at the time he initiated a criminal complaint against Harris did not support probable cause, that Special Agents Rotunno and Baccus failed to adequately investigate Harris' identification, and that Rotunno and Baccus fabricated evidence and/or coerced witness testimony to create probable cause.

It is undisputed that at the time of the filing of criminal charges against Harris, Harris had

been identified as "Little Head" through photo identification and corroboration by the CPD. However, the record shows some inconsistencies in the basis for this identification and any information corroborating it. Specifically, the reports of investigation noting sightings of "Little Head" on the streets while Harris was actually in Cook County custody, the CI's identification of two different people as "Little Head" in the photographs taken from Thomas' apartment, and the CPD's claim that "Little Head" was wanted on a domestic battery warrant when Harris did not have a domestic battery warrant on his criminal record.

There are also questions regarding Grant's corroborating photo identification of Harris as "Little Head." In July of 2010, Baccus interviewed Grant and referred to an individual named "'Teddy Tinsley' aka 'Little Head'" in her report. The report also stated that Grant told her that "Teddy Tinsley" was known as "Little Head" and that Harris was known as "Barney." While Baccus testified that it is possible she inadvertently inverted the nicknames while drafting her report, there is still an issue of fact as to whether she actually did mistakenly invert the nicknames. Grant later identified Harris as "Little Head" after reviewing Harris' photograph. However, the photograph used to question Grant was the same photograph marked by the CI during the initial identification of Harris as "Little Head." The photograph in question is allegedly initialed by both the CI and Grant, and marked with the notation "Little Head" at the bottom. The possibility that Grant saw these markings calls into question the reliability of his identification.

These factors could undermine the accuracy of the CI's identification, and it is not clear from the record to what extent ATF was aware of these discrepancies at the time Harris' arrest warrant was issued. There is a genuine issue of material fact as to whether ATF had probable

12

cause, and whether they were aware that the CI was not credible and chose to purposely use unreliable information to obtain Harris' indictment. Viewing the facts in a light most favorable to Harris, the evidence is such that a reasonable jury could make a finding that ATF lacked probable cause for Harris' arrest. This rebuts the presumption of probable cause from Harris' grand jury indictment.

## Malice

In the context of a claim of malicious prosecution, "malice" means that the "officer who initiated the prosecution had 'any motive other than that of bringing the guilty party to justice.'" *Aleman v. Vill. of Hanover Park*, 662 F.3d 897, 907 (7th Cir. 2011) (quoting *Carbaugh v. Peat*, 189 N.E.2d 14, 19 (1963)). A trier of fact may infer malice from a lack of probable cause when there is no other credible evidence that refutes the inference. *Jimenez v. City of Chicago,* 830 F. Supp. 2d 432, 451 (N.D. Ill. 2011). As noted above, there is a genuine issue of material fact as to whether ATF had probable cause for Harris' arrest and the Government provides no evidence that refutes the inference of malice. Thus, there is an issue of material fact as to whether ATF had any motive other than that of bringing the guilty party to justice.

As there is a genuine issue of material fact with regards to three of the five required elements for a malicious prosecution claim, the Government's Motion is denied.

### *Intentional Infliction of Emotional Distress*

Under Illinois law, an intentional infliction of emotional distress claim requires proof that: (1) the conduct involved was "truly extreme and outrageous"; (2) the actor must either intend that his or her conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress; and (3) the conduct must

13

cause severe emotional distress. *Cairel*, 821 F.3d at 835 (7th Cir. 2016), *cert. denied,* (U.S. Nov. 28, 2016). "'Extreme and outrageous' conduct does not include 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' Instead, the conduct must go beyond all bounds of decency and be considered intolerable in a civilized community.'" *Id.* Harris argues that Rotunno and Baccus engaged in extreme and outrageous behavior by manufacturing false evidence against Harris, using "impermissibly suggestive" identification procedures, failing to investigate exculpatory evidence, and coercing a false identification of Harris as "Little Head" from Grant. As set forth above, there is a factual dispute as to whether Rotunno and Baccus made mistakes in the investigation, and whether these mistakes rise to the level of "truly extreme and outrageous" conduct. These are both questions that should be resolved at trial. The Government's Motion is denied as to Harris' intentional infliction of emotional distress claim.

*Negligent Infliction of Emotional Distress*

"Under Illinois law, for a direct victim to state a claim of negligent infliction of emotional distress, he must allege: (1) that defendant owed plaintiff a duty; (2) that defendant breached that duty; and (3) that plaintiff's injury was proximately caused by that breach." *Brown v. Kouretsos*, No. 15 C 11076, 2016 WL 3269000 at *5 (N.D. Ill. June 15, 2016). The Government argues that ATF did not owe Harris a duty because they had no "obligation not to negligently inflict emotional distress" on him. (137 at 15.) This argument is overly broad and unpersuasive. To determine whether a defendant owed a duty to a plaintiff, Illinois courts consider: "various policy considerations, such as the likelihood of harm, the gravity of the injury, the burden of guarding against the injury, and the relationship between the parties." *Roehl v. Merrilees*, No. 11 C 4886, 2012 WL 1192093, at *9 (N.D. Ill. Apr. 10, 2012). Harris claims he was

14

wrongfully detained as a result of the "negligent" acts of ATF, and that he suffered from severe emotional distress because he experienced threat of physical danger thereafter on a daily basis. The Government argues that Harris cannot bring a false arrest claim because it is time-barred. However, Harris is not bringing a false arrest claim. Harris is bringing a negligent infliction of emotional distress claim and is partially basing that claim on alleged false arrests. The Government makes no other argument that there is no genuine issue of fact as to the rest of the elements of Harris' claim. Therefore, the Government's Motion is denied as to Harris' negligent infliction of emotional distress claim.

*Abuse of Process*

To establish an abuse-of process claim, Harris must show: (1) the existence of an ulterior purpose or motive for the use of regular court process, and (2) an act in the use of process not proper in the regular prosecution of a suit. *Ball v. City of Chicago,* No. 90 C 2331, 1991 WL 152897 at *5 (N.D. Ill. Aug. 1, 1991). The Government argues that there is no evidence that Rotunno initiated criminal proceedings for any improper purpose or of an "act in the use of process not proper." Harris provides nothing in response to the Government's argument. Harris also provides no argument as to what he believes the Government's purpose might be and points to no action by the Government throughout his criminal proceedings that was improper such that there was an abuse of process. The Government's Motion is granted as to Harris' abuse-of-process claim.

## CONCLUSION

For the foregoing reasons, the Government's Motion for Summary Judgment [136] is granted in part and denied in part.

Date: February 28, 2017

JOHN W. DARRAH
United States District Court Judge